**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**AMIN HAYES**                                                                              **PLAINTIFF**

**V.**                                                   **CAUSE NO. 3:10-CV-00382-CWR-LRA**

**ENMON ENTERPRISES, LLC, d/b/a**
**JANI-KING OF JACKSON; JANI-KING**
**FRANCHISING, INC., AND JOHN AND**                                  **DEFENDANTS**
**JANE DOES 1-10**

<u>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**</u>

The above-styled matter is before the Court on Defendant Jani-King Franchising, Inc.'s

Motion for Summary Judgment [Docket No. 33]. The Court has reviewed both parties'

arguments and the evidence relevant thereto and, after due consideration, has concluded that the

motion should be denied.

Amin Hayes was an employee of the Comcast Corporation on August 14, 2009, when

Enmon Enterprises, LLC (hereinafter "Enmon") was providing janitorial services to Comcast's

restrooms at an office building in Madison County. Hayes alleges that he entered one such

restroom, and as he walked across the floor, he slipped on the wet, recently mopped surface and

sustained injuries. According to Hayes, the room contained no warning regarding the wet surface.

Amended Complaint [Docket No. 11] at 2-3.

Hayes brought suit against Enmon for negligence and negligent supervision/training. He

also sued Jani-King Franchising (hereinafter "Jani-King"), which holds a franchising agreement

with Enmon, under a theory of *respondeat superior*.

On April 11, 2011, Jani-King moved for summary judgment [Docket No. 33]. According

1

to Jani-King, it did not enjoy sufficient authority over Enmon's performance of its duties to warrant vicarious liability. Hayes responded by arguing that the Franchise Agreement between Jani-King and Enmon contains language that creates a genuine issue of material fact as to whether the former exercised control over the latter.

Both parties base their arguments almost entirely on the Franchise Agreement between Enmon and Jani-King. *See* Exhibit B to Motion for Summary Judgment [Docket No. 33-2]. According to Jani-King, the Agreement explicitly places sufficient distance between itself and Enmon's operation to leave no genuine issue of material fact as to whether Jani-King enjoyed a degree of control over Enmon. In its Motion, Jani-King argues that:

> 3.     The Franchise Agreement allows Enmon, as franchisee, to use the "System" of "comprehensive cleaning and maintenance business . . . and the supply and distribution of complete cleaning and/or maintenance related services, including, but not limited to, commercial, industrial, institutional and residential cleaning;" and to utilize the reputation, the trade name of Jani-King and related trademarks.
> 4.     The Franchise Agreement between [Jani-King] and Enmon specifically provides that Enmon "is, and will act at all times as, an independent contractor and will not, at any time, directly or indirectly, hold itself out as an agent, servant, or employee of [Jani-King]. No acts or assistance given by [Jani-King] shall be construed to alter the fact that [Enmon] is an independent contractor.["]
> . . .
> 6.     The Franchise Agreement does not allow [Jani-King] to control the daily operations of Enmon.
> 7.     The Franchise Agreement does not proscribe [*sic*] the details or manner in which cleaning should be done.

Def. Mot. at 2.

Ultimately, in Jani-King's view, "Enmon, not [Jani-King], was contracted to provide cleaning services for the . . . [b]uilding . . . which is occupied by Comcast Corporation." Def. Mot. at 2.

Hayes, however,  focuses on other provisions of the Franchise Agreement. Subsection

4.2, for example, establishes that Enmon "will follow [Jani-King]'s current, established JANI-KING policies, practices, procedures and standards, and as they may be amended from time to time, and agrees not to deviate therefrom without prior written consent of [Jani-King]." Exhibit B to Def. Mot. [Docket No. 33-2] at 3. Under Subsection 4.7, Enmon agrees to pay Jani-King a set of royalties on a monthly basis. Exhibit B to Def. Mot. at 3. Subsection 4.13(c) grants Jani-King the right to review Enmon's books, records, and accounts, Exhibit B to Def. Mot. at 5-6, and Jani-King "reserve[d] the right to establish and/or change Company policies and/or procedures pertaining to the operation of [Enmon]'s franchised business, the terms of this Agreement, or Franchises subject to the license granted under this Agreement" in Subsection 4.29. Exhibit B to Def. Mot. at 9.

Hayes contends that these provisions, in sum, "demonstrate[ ] the power and control [that] Defendant Jani-King retains over the operation of its franchisee, and creates vicarious liability." Plaintiff's Memo in Support of Response in Opposition [Docket No. 36] at 3.

For purposes of the question of whether vicarious liability may attach, "[t]here are three types of situations in which a party principal may seek to have someone else perform some service for him: (1) principal and agent, (2) master and servant, and (3) independent contractor." *Richardson v. APAC-Mississippi, Inc.*, 631 So. 2d 143, 147 (Miss. 1994). Jani-King contends that Enmon was its independent contractor; Hayes argues instead that Jani-King was master to the servant Enmon.

By the Mississippi Supreme Court's own admission, these concepts are not defined by clearly established boundaries, and decades of attempts have led to inconsistent results. *See id.* at 149. The line separating servant from independent contractor, as that Court has observed, "is not

a line at all but a twilight zone filled with shades of gray. . . . Not that such a definition is not

needed. It is simply beyond our capacity, for not only are we confounded by the limitations of

language; the underlying realities are even more amorphous and elusive." *Fruchter v. Lynch Oil

Co.*, 522 So. 2d 195, 199 (Miss. 1988).

Generally speaking, "[a]n independent contractor is a person who contracts with another

to do something for him but who is not controlled by the other nor subject to the other's right to

control with respect to his physical conduct in the performance of the undertaking." *Richardson*,

631 So. 2d at 148. An employee or servant, on the other hand, "is a person employed by an

employer to perform service in his affairs whose physical conduct in the performance of the

service is controlled or is subject to the right to control by the employer." *Heirs & Wrongful

Death Beneficiaries of Branning ex rel. Tucker v. Hinds Cmty. Coll. Dist.*, 743 So. 2d 311, 318

(Miss. 1999).

Elusive though it may be, the distinction is critically important, for although the negligent

acts of an employee committed within the course and scope of his employment may subject his

employer to liability, those of an independent contractor will not. *See Odier v. Sumrall*, 353 So.

2d 1370, 1372 (Miss. 1978).  Toward that end, the Mississippi Supreme Court has delineated ten

factors of particular relevance:

- Whether the principal master has the power to terminate the contract at will.

- Whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment.

- Whether he furnishes the means and appliances for the work.

- Whether he has control of the premises.

4

- Whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output.

- Whether he has the right to prescribe and furnish the details of the kind and character of work to be done.

- Whether he has the right to supervise and inspect the work during the course of employment.

- Whether he has the right to direct the details of the manner in which the work is to be done.

- Whether he has the right to employ and discharge the subemployees and to fix their compensation.

- Whether he is obliged to pay the wages of said employees.

*McKee v. Brimmer*, 39 F.3d 94, 97 (5th Cir. 1994)(citing *Richardson*, 631 So. 2d at 148).

These questions are designed to focus on "the core issue [of] whether the employer had sufficient control that he ought to be held liable for the negligent acts of the 'employee.'" *Hiltgen v. Sumrall*, 47 F.3d 695, 704-04 (5th Cir. 1995). Ultimately, "[c]ontrol and the right to control are key to determining whether an agency relationship exists." *Miller v. R.B. Wall Oil Co., Inc.*, 970 So. 2d 127, 132 (Miss. 2007). *See also Mississippi Dept. of Emp't Sec. v. Harbin*, 11 So. 3d 137, 140 (Miss. App. 2009)("In determining whether an individual is an employee or an independent contractor, the central issue is whether the employer has the right to exercise control over the work of the employee.") (quotations omitted).

A review of the Franchise Agreement strongly suggests that Jani-King and Enmon intended to create an independent-contractor relationship. At Subsection 15.7, the two acknowledged that "[i]t is agreed and understood that [Enmon] is, and will act at all times as, an independent contractor and will not, at any time, directly or indirectly, hold itself out to be an

agent, servant or employee of [Jani-King]." Exhibit B to Def. Mot. at 22.

But the devil, of course, is in the details, and even the explicit intent to limit an agent's relationship to that of an independent contractor does not dispose of the question of whether that attempt was successful. All relevant evidence, including the totality of an agreement between contracting parties and any proof regarding the parties' conduct, should be considered. *Tucker*, 743 So. 2d at 318.

Undoubtedly, other aspects of the Franchise Agreement also support the conclusion that the contract established Enmon as an independent contractor. At Subsection 4.14, Enmon agreed to "be responsible for all labor, equipment, materials, tools and supplies necessary to perform" its services. Exhibit B to Def. Mot. at 6. Jani-King's renouncing of any obligation to "furnish[ ] the means and appliances for the work," *McKee*, 39 F.3d at 97, persuades in favor of concluding that Enmon was an independent contractor.[1] Likewise, at Subsection 15.2, Enmon and Jani-King agreed that "[n]othing in this agreement shall be construed to prevent [Enmon] from freely setting its own prices and discounts for services and products which it may render or sell." Exhibit B to Def. Mot. at 21. This provision indicates that Jani-King did not "ha[ve] the power to fix the price in payment for the work," *McKee*, 39 F.3d at 97, and provides more evidence of that Enmon was merely an independent contractor.

But other provisions within the Franchise Agreement more closely resemble characteristics of an employer-employee relationship. For example, at Subsection 8.1, Enmon "agree[d] that it may not cancel or terminate" the agreement after its execution, Exhibit B to Def.

---

[1] *But see* Exhibit B to Def. Mot. at 10 ("All documents, forms, manuals and other Confidential Information, and/or translations or variation thereof, shall remain the exclusive property of [Jani-King].").

Mot. at 13, but Section 9.1 lists no fewer than 15 conditions which entitle Jani-King, "at its option, [to] terminate this Agreement and all rights granted hereunder, without affording [Enmon] any opportunity to cure the default, effective immediately upon the provision of notice . . . ." Exhibit B to Def. Mot. at 14. This arrangement closely resembles "the power to terminate the contract at will," *McKee*, 39 F.3d at 97, which is the first of the 10 factors used by Mississippi courts to evaluate the character of agency relationships.[2]

Other provisions unrelated to the means of termination also persuade against a determination of Enmon's independent-contractor status. Subsection 3.1 affords that Enmon "shall operate [its] business at or from a location of its choosing," but only "subject to the approval of [Jani-King], upon the terms and conditions set forth herein." Exhibit B to Def. Mot. at 2. The agreement also calls for Enmon "to maintain a clean and safe place of business . . . ." Exhibit B to Def. Mot. at 7. More specifically, at Subsection 4.27, Enmon "agree[d] that [Jani-King] must approve office location, furniture and decor thereof to protect the image and reputation of JANI-KING." The same provision required Enmon to "maintain such office and all fixtures, furnishings, signs and equipment located thereon in good order and condition, and in conformity with the JANI-KING system image as such may be prescribed by [Jani-King] from time to time." The agreement also averred that Enmon "shall, within a reasonable time specified by [Jani-King], make all necessary additions, alterations, repairs and replacements to the office as required by [Jani-King], but no others without [Jani-King]'s prior written consent, including, but

---

[2] Although the provisions circumscribe Jani-King's authority to terminate the relationship, the lengthy set of pitfalls set before Enmon, as compared to the invulnerability enjoyed by Jani-King, more closely illustrates a relationship in which Enmon is an entity "whose physical conduct in the performance of the service is controlled or is subject to the right to control by the employer." *Tucker*, 743 So. 2d at 318.

not limited to, periodic repainting or replacement of signs, furnishings, equipment or decor." Exhibit B to Def. Mot. at 9.

These limits against Enmon's authority over its workspace lead invariably to the conclusion that Jani-King "ha[d] control of the premises," thereby satisfying in Hayes' favor the fourth of the factors. *McKee*, 39 F.3d at 97.

Section 4.23 establishes that Jani-King will "provide a comprehensive Operational Training Program for [Enmon] . . . that will include a total of Thirty (30) hours of training and on-site assistance," which will consist of "an extensive training session of approximately fifteen (15) hours duration, at a location to be established by [Jani-King], which will include JANI-KING methods and procedures for cleaning, contract sales, as well as operations and office management, using formal instruction, self study materials and practical training." Exhibit B to Def. Mot. at 8. At Section 4.21, the Franchising Agreement also mandates attendance at occasional Jani-King training sessions, meetings and seminars. Exhibit B to Def. Mot. at 3. The agreement does not speak to the character of these conventions, but their mandatory character alone amounts "to prescri[ption] and furnish[ment of] the details of the kind of character of work to be done." *McKee*, 39 F.3d at 97. These provisions further persuade in favor of concluding that Enmon was Jani-King's employee rather than its independent contractor.

Still other factors support Hayes' argument. In Subsection 4.2, Enmon agreed that it "will follow [Jani-King]'s current, established Jani-King policies, practices, procedures and standards, and as they may be amended from time to time, and agrees not to deviate therefrom without prior written consent of [Jani-King]." Exhibit B to Def. Mot. at 3. Also, Subsection 4.14 required Enmon to perform its tasks "in a good and workmanlike manner," and that should it fail to do so,

that provision permitted Jani-King to "assume the rights and obligations under the contract with [a] customer and service or supply such contract itself, without obligation to pay any royalties or other amounts to [Enmon]."[3] Exhibit B to Def. Mot. at 6. This evidence satisfies the eighth factor and suggests that Jani-King "ha[d] the right to direct the details of the manner in which the work is to be done." *McKee*, 39 F.3d at 97.

Moreover, Jani-King's right to swoop in and take over in the event of an unsatisfactory performance, combined with its requirement that Enmon "maintain and preserve full, complete and accurate books, records and accounts regarding [its] business," subject to Jani-King's review at 30 days' notice, Exhibit B to Def. Mot. at 5-6, favors the conclusion that Jani-King "ha[d] the right to supervise and inspect [Enmon's] work during the course of employment," *McKee*, 39 F.3d at 97, thereby satisfying the seventh factor in Hayes' favor as well.

The agreement appears to leave the ninth and tenth factors unaddressed; neither party has briefed the Court on the applicability of the individual factors, and if these two are discussed explicitly, then their presences elude detection. But given the parties' avowed intent to create an independent-contractor relationship, one could assume that Enmon and Jani-King intended to bring their agreement on these final matters within the confines of the established legal parameters for independent contractors.

Even if one allows Jani-King that assumption, though, the analysis concludes with five factors suggesting that Enmon was Jani-King's independent contractor and five others persuading in favor of an employer-employee relationship.

---

[3] This provision, at the very least, cuts against Enmon's explicit "agree[ment] to be solely responsible for the Services and results of such Services performed by [Enmon] . . . ." Exhibit B to Def. Mot. at 6.

The Court is left, then, with "the core issue [of] whether the employer had sufficient control that he ought to be held liable for the negligent acts of the 'employee.'" *Hiltgen v. Sumrall*, 47 F.3d 695, 704-04 (5th Cir. 1995). "[T]he central issue is whether the employer has the right to exercise control over the work of the employee." *Mississippi Dept. of Emp't Sec. v. Harbin*, 11 So. 3d 137, 140 (Miss. Ct. App. 2009). Moreover, "the potential control does not create [vicarious] liability unless the alleged master had the right to control the means as well as the ends." *Allen v. Choice Hotels Int'l*, 942 So. 2d 817, 821 (Miss. Ct. App. 2006). In other words, "[i]f the party . . . is concerned only with the ultimate results and not the details of . . . work," *Fruchter v. Lynch Oil Co.*, 522 So. 2d 195, 199 (Miss. 1988), then that "fact premise sometimes point[s] to non-liability," *id.*, for the alleged master.

The evenly split results of the lengthy factor-based inquiry used in Mississippi courts makes clear that the question is a close one. But ultimately, when viewed in the light most favorable to Hayes' case, the evidence supports the conclusion that Jani-King was not concerned only with the end results of Enmon's work. Its Franchise Agreement contained provisions designed to control the training of Enmon's employees, the location and appearance of Enmon's place of business, and the "policies, practices, procedures[4] and standards" by which Enmon performed its work. Exhibit B to Def. Mot. [Docket No. 33-2] at 3. Jani-King reserved the right to take over any job in which it viewed Enmon's technique inadequate, and Jani-King maintained the power to terminate the agreement at any time for any number of reasons. Undoubtedly, the

---

[4] The use of this word in particular should stand out to attorneys. From the first semester of law school, students are taught that "[p]rocedure is the means; full, equal and exact enforcement of substantive law is the end." *Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 62 (1952) (Frankfurter, J., dissenting).

10

relationship does not closely resemble the employer-employee relationship as most laymen conceive it. But for all the murkiness of this body of law, Mississippi courts abide fundamentally by the principle that "[a] servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master." *Richardson v. APAC-Mississippi, Inc.*, 631 So. 2d 143, 148 (Miss. 1994). Close though the question is, when read as consistently as possible with Hayes' position, the Franchise Agreement demonstrates a degree of control over Enmon's physical conduct too great to pass off the relationship as one creating an independent contractor.

It is true that when a case's underlying facts are undisputed, the question of whether an employer-employee relationship exists is one of law. *Richardson v. APAC-Mississippi, Inc.*, 631 So. 2d 143, 152 (Miss. 1994).   However, written agreements like the one now at issue are not the only relevant species of evidence; conduct of the parties also should be evaluated. *Walker v. McClendon Carpet Serv., Inc.*, 952 So. 2d 1008, 1010 (Miss. Ct. App. 2006). Therefore, the Court's conclusions regarding the effect of the Franchise Agreement stand merely as recognition of the existence of a genuine issue of material fact on the question of whether Jani-King and Enmon created an employer-employee relationship. Given the contract's "conflicting indicia," that question must be left to a jury. *See Newcomb v. North East Ins. Co.*, 721 F.2d 1016, 1019 (5th Cir. 1983).

Therefore, Jani-King's Motion for Summary Judgment [Docket No. 33] is denied.

SO ORDERED this Twenty-Second day of June 2011.

/s/ *Carlton W. Reeves*
Hon. Carlton W. Reeves
United States District Court Judge

11